Helen **BORYK**, as Administratrix of the Estate of William Boryk, Jr., Deceased, Helen Boryk, individually and as surviving widow of William Boryk, Jr., Helen Boryk, as Natural Guardian of Stephanie Boryk, an infant, Plaintiff,

v.

**AEROLINEAS ARGENTINAS**, The de Havilland Aircraft Co., Ltd., and de Havilland Aircraft Inc., Defendants.

United States District Court
S. D. New York.
April 8, 1964.

---

1. Oregon Revised Statutes.

2. ORS 168.085 and ORS 167.050.

Speiser, Shumate, Geoghan & Law, New York City, for plaintiff, Edward M. O'Brien, New York City, of counsel.

Mendes & Mount, New York City, for defendant The de Havilland Aircraft Co., Ltd., B. E. Haller, J. F. Byrne, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

Plaintiff, a resident of Connecticut, sues in her respective capacities as administratrix of decedent's estate, his surviving widow and guardian of their daughter, to recover for his wrongful death in the crash of a Comet IV jet airliner at Sao Paulo, Brazil, on November 23, 1961.

The aircraft was owned and operated by defendant Aerolineas Argentinas (Argentinas), an Argentinian corporation doing business in New York. It had been designed and manufactured by defendant The de Havilland Aircraft Co., Ltd. (Limited), a corporation organized under the laws of the United Kingdom with its principal place of business in

England. The third defendant, de Havilland Aircraft, Inc. (Incorporated), is a Delaware corporation authorized to do business in New York with its principal place of business there. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332(a).

Defendant Limited, appearing specially, moves to dismiss the complaint as to it and to quash service of process upon it upon the grounds (a) that it is an alien corporation not present in this state and therefore not subject to the jurisdiction of this court, and (b) that process has not been served on anyone entitled to be served on its behalf. In the alternative, Limited seeks dismissal upon the ground of improper venue.

The other two defendants have not contested service and have answered the complaint.

The claim against Limited is predicated upon alleged negligence in the design, assembly, manufacture and servicing of the Comet IV aircraft in which decedent was killed and breach of express and implied warranties that the aircraft and its parts were fit for the purposes for which they were sold and intended. None of the acts upon which liability is asserted are alleged to have occurred in New York. Plaintiff claims to have made service of process on defendant Limited by personally delivering copies of the summons and complaint to Ian S. Fossett individually and as president of Incorporated. Plaintiff maintains that Limited is subject to jurisdiction here and that Fossett or Incorporated, or both, were in fact the managing agents of Limited in this state.

Limited, on the other hand, relying on an affidavit of Fossett in support of its motion to dismiss, denies that it conducted any significant activities here which would subject it to jurisdiction and that either Fossett or Incorporated was its managing agent.

After Limited had made its motion to dismiss, plaintiff submitted extensive interrogatories to Limited concerning facts claimed to bear on the question of jurisdiction, and Limited has answered those interrogatories. Plaintiff then took the deposition of Fossett on the same questions. She relies largely on facts obtained from these two sources as delineated in an affidavit by one of her attorneys, to sustain her burden of establishing jurisdiction. Defendant Limited has not replied to the answering affidavits but contends that the facts presented do not sustain plaintiff's burden. Neither side has asked for a hearing or for further discovery, and both are content to have the motion decided on the papers before me.

### Facts

Limited is a leading British manufacturer of military and civilian aircraft. Together with its wholly owned engine and propeller subsidiaries, which are also British companies, it has its principal offices in Hertfordshire, England, and its various manufacturing and assembly plants and facilities are also in that country.[1]

Limited produced the Comet IV commercial airliner involved in this case as well as the Dove and the Heron, which are private or executive planes. It has also been developing and is producing the Trident, a new commercial airliner, and a new and improved Dove 800. Limited makes component parts and equipment for the planes which it manfactured. It is presently a member of the Hawker-Siddeley Group representing United Kingdom aviation interests in world competition.

Limited has not qualified to do business in New York and has designated no agent here for the service of process. It has no offices and no assets in this state. Its name is not listed in any New York telephone directory. It has no bank

[1] There have been various corporate changes and regroupings of Limited and its engine and propeller subsidiaries. But for the purposes of this motion the entity can be considered the same throughout the relevant period.

accounts here and has sold no airplanes in New York.

Incorporated is a wholly owned subsidiary of Limited, organized under the laws of Delaware in 1954. Its main offices and storeroom are at the Marine Terminal, LaGuardia Airport in Flushing. Jane's All The World's Aircraft lists Incorporated as one of Limited's associated companies overseas and the World Aviation Directory lists Incorporated as distributor for Limited.

Prior to 1954 Fossett, a British subject, was the American representative of Limited and a salaried employee of that company. From April 1952 until 1954 he maintained offices in that capacity at Linden, New Jersey. The nature and extent of his activities on behalf of Limited during this period are by no means clear. Apparently, however, Fossett was concerned with the promotion of sales of Dove and Heron planes manufactured by Limited, substantial numbers of which were sold in this country through distributors, and of parts and equipment for such planes.

In October 1954 Incorporated was organized at the instance of Limited, which is its sole stockholder. Fossett became its president. Upon its organization Incorporated took over premises at the Marine Terminal in LaGuardia Airport which had been leased by Limited from the Port Authority in August of 1954, and carried out the obligations under that lease until May 1956 when it entered into its own lease with the Port Authority. Apparently Fossett discontinued whatever activities he had previously carried on for Limited when Incorporated commenced business, though he continued on Limited's payroll until the end of 1955, during part of which time he was convalescing from a motor accident. Thereafter his salary was fully paid by Incorporated and he has received no compensation from Limited since. Since it commenced operations in 1954, Incorporated has had its own officers and employees, some 16 in number, none of whom were officers or employees of Limited. It has paid their salaries and all of its own expenses and has kept its own books, records and accounts, which have not been consolidated in any way with those of its parent.

The original board of directors of Incorporated consisted of four British officers and directors of Limited or its subsidiaries, Fossett and a member of a New York law firm. In 1962, at the time of the commencement of the action, it appears that three of the members of its board were officers and directors of Limited, and the others were Fossett, the president of Incorporated, Royce, its vice president, who was the original lawyer director, and Hoffman, its secretary and treasurer.

From 1954 to 1962 the largest part of the business conducted by Incorporated was the sale of parts and equipment for de Haviland Dove and Heron aircraft owned and operated in this country. The major portion of these products was purchased from Limited and its subsidiaries in England. Other parts, when interchangeable, were obtained in this country. Incorporated maintained stock levels of parts at its storeroom at LaGuardia Airport and purchased as it saw fit from Limited and others to maintain the necessary levels. It sold to numerous purchasers throughout the country.

Incorporated also sold spare parts for Avro and Argosy aircraft manufactured in England by other companies which were members of the Hawker-Siddeley Group and did a substantial volume of such business, though some three-quarters of its spare part business appears to have been for de Havilland aircraft. In addition Incorporated was the distributor for Vallay Industries, Limited, a British corporation which manufactured aircraft polish.

Incorporated also sold Dove and Heron aircraft produced by Limited, and Otter and Beaver aircraft manufactured by Limited's Canadian subsidiary. However, the numbers of such aircraft which it sold were relatively small, and its aircraft sales were secondary to its spare parts business.

In January 1956 Incorporated entered into an agreement with Limited and its engine and propeller subsidiaries which, with some changes not material here, continued in force until September 30, 1961. This agreement gave Incorporated the sole right to purchase de Havilland Doves and Herons and the engines, propellers, parts and other equipment for such aircraft from Limited and its subsidiaries for sale anywhere in the United States. Limited and its subsidiaries agreed to supply such aircraft and products upon order from what was next available in their production lines with payments to be made by Incorporated within thirty days at current list price less discount. Incorporated was authorized to resell aircraft, parts and equipment so purchased at prices determined by it, acting as principal and not as agent of Limited or its subsidiaries. On such resale Incorporated was required to give to the purchaser warranties no less favorable than the standard warranties issued by the English companies. It was free to carry on other business provided it was non-competitive.

Under the agreement Incorporated undertook to provide after-sale service for Dove and Heron aircraft owned and operated in the United States. There were some 70 of such aircraft in this country, about 65 of which had been sold prior to the organization of Incorporated. The service to be furnished was that normally provided "by an aircraft manufacturer of repute in support of its products" and included carrying out of work and replacement of spare parts under the terms of the standard Limited warranties, normal maintenance and overhaul and advice to operators. Incorporated was required to report to Limited the number of Doves and Herons currently operated in the United States and the nature and extent of the services it furnished.

To enable Incorporated to fulfill these obligations, Limited agreed to send to the United States such specialist engineers as might be necessary from time to time, and to charge Incorporated the cost of providing such engineers. These engineers were to be paid by Limited and to remain directly responsible to it, but Incorporated was free to call upon them for such services as might be required. Limited agreed to pay Incorporated a service fee of $70,000 a year for undertaking these obligations, increased to $85,000 in 1958.

During the period when the service agreement was in effect from time to time twelve different service engineers employed by Limited were in this country. They made use of the New York offices of Incorporated when they were in New York. Their maintenance and subsistence were paid by Incorporated, and Incorporated supplied them with credit cards for oil and gas and for other expenses while they were here. The engineers were not authorized to make any binding agreements.

The service agreement was terminated in September 1961, several months before the accident which is the subject matter of this action happened and more than a year prior to the commencement of the action, and payment of the service fees was discontinued. At the time of the commencement of the action there apparently was one Limited service engineer in Texas, and in 1962 a service engineer paid by Limited did some work on a demonstration aircraft which Incorporated had in New York. But servicing under the agreement had come to an end. However, Incorporated still continued as the sole distributor in this country of spare parts and equipment for Dove and Heron planes, which was the principal part of its business, and also for these airplanes. In the latter connection Limited had an arrangement with Barclay's Bank in New York under which the Bank advanced funds to pay duty on aircraft sold to Incorporated and was reimbursed by Incorporated for the funds so advanced after Incorporated was paid by its customers.

Incorporated also on occasion purchased in this country and shipped to England equipment to be used in the manufacture of Limited aircraft and

Whitsworth-Gloster (Argosy) aircraft there, though the extent or frequency of such purchases does not appear.

Incorporated was not authorized to sell the Comet or the Trident, the two commercial airliners produced by Limited. Sales of such aircraft were apparently made directly by the parent company. However, there is nothing in the record to show that any sales of either of these aircraft were ever made in the United States.

On occasion representatives of Limited came to New York on business visits, though how frequently does not appear. While here such representatives made use of the offices of Incorporated at LaGuardia Airport, and Incorporated also made quarters available for them. In 1957, on one of such visits, negotiations between Limited and Capitol Airlines resulted in a contract between Limited and Capitol for the sale of some 14 Comet airliners to Capitol, which was later cancelled. There were also some negotiations with respect to the sale of Comets to Pan American Airlines in 1959 and of Tridents to American Airlines at some unspecified time. Fossett, the president of Incorporated, was present as an observer at these negotiations but took no active part therein. Fossett also sent desk models of such aircraft to a number of airlines in this country.

Incorporated obtained its capital through the purchase of its shares by Limited for the sum of $230,000, credited one-half to capital and one-half to surplus. In 1960 Limited made a loan of $84,000 to Incorporated without interest, to be repaid when the cash position of Incorporated permitted, and this loan is still outstanding.

From the time it commenced business in 1954 through the end of 1962 Incorporated had gross sales of approximately $7,500,000. It appears from its 1962 financial statements that for the year 1962 its gross business was approximately $1,775,000. Its total net profits from 1954 through 1962 were approximately $190,000, ranging from about $12,000 to $49,000 per year. In 1962 its

net profits were some $22,000. In each of the years from 1955 through 1962 it paid dividends to Limited as its sole stockholder, amounting in all to some 38% of its net profits. At the end of 1962 it had an airplane parts inventory of $1,206,550, consisting of $546,259 in de Havilland parts and $660,299 in Whitsworth-Gloster (Argosy) parts. It then owed Limited $466,723.42, including the unpaid 1960 loan.

*The amenability of Limited to suit in this district.*

■ It is now settled in this circuit that, in an action based on diversity of citizenship, the question of whether a defendant is amenable to suit in this court is to be determined on the basis of constitutionally valid state law. Arrowsmith v. United Press International, 320 F.2d 219 (2 Cir. 1963) (en banc). Thus we turn to New York law to determine whether Limited is amenable to suit here and subject to the jurisdiction of this court.

■ Under New York law applicable to a foreign corporation the question is, of course, the well-worn one of whether the corporation is "doing business" in this state. The applicable test "is the classic 'presence' test, as found in the leading cases (e. g., Tauza v. Susquehanna Coal Co., Inc., 220 N.Y. 259, 115 N.E. 915)." Fremay, Inc. v. Modern Plastic Mach. Corp., 15 A.D.2d 235, 240, 222 N.Y.S.2d 694, 700 (1st Dept. 1961); Simonson v. International Bank, 16 A.D.2d 55, 225 N.Y.S.2d 392 (1st Dept. 1962). See also Cook v. Bostitch, Inc., 328 F.2d 1 (2 Cir. 1964).

The classic "presence" test is framed in Tauza v. Susquehanna Coal Co. in the following language (220 N.Y. at 268, 115 N.E. at 917):

"Unless a foreign corporation is engaged in business within the state, it is not brought within the state by the presence of its agents. But there is no precise test of the nature or extent of the business that must be done. All that is requisite is that

enough be done to enable us to say that the corporation is here."

And as the court said earlier in its opinion (220 N.Y. p. 267, 115 N.E. p. 917):

> "If in fact it [the corporation] is here, if it is here, not occasionally or casually, but with a fair measure of permanence and continuity, then, whether its business is interstate or local, it is within the jurisdiction of our courts."

The plaintiff advances three theories on which it claims that Limited is present in this state for purposes of jurisdiction. It is urged (a) that Limited is here because of its own activities in this state, quite apart from those of Incorporated; (b) that Fossett individually represented Limited here as its managing agent, and that Limited was therefore present in this state through him; and (c) that in any event Limited is present here through its wholly owned subsidiary Incorporated.

■ The first two of these theories may be readily disposed of. Plaintiff has not pointed to any activities carried on in this state by Limited as distinguished from Incorporated which would constitute doing business by Limited here and thus satisfy the presence test. No activities at all have been shown subsequent to 1959, more than a year prior to the commencement of this action. Indeed, so far as appears from this record, Limited's activities in this state during the entire period subsequent to 1954 are only occasional, casual and isolated. New York has not changed its rule that mere isolated contacts are insufficient to give jurisdiction over a foreign corporation. Simonson v. International Bank, supra.

Nor does it appear that since 1954 Fossett, acting as an individual, has done anything here on Limited's behalf. Throughout that period he appears to have acted solely in his capacity as president of Incorporated. There is thus no merit to the contention that Fossett individually acted as managing agent of Limited in this state, or that Limited was present here through him.

The question presented here then is the frequently troublesome one of whether a foreign corporation (Limited), with a wholly owned subsidiary (Incorporated) doing business in this state, is itself doing business and present here through the activities of its subsidiary.

■ It is clear under New York law that mere ownership by a foreign corporation of stock of a subsidiary doing business in the state does not subject the foreign corporation to jurisdiction. Nor may the parent be subjected to the jurisdiction of the New York court merely on the basis of the activities of its subsidiary. As long as the separation between the parent and the subsidiary though formal is real the subsidiary's activities will not subject the parent to jurisdiction. Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); Cook v. Bostitch, Inc., supra; Berkman v. Ann Lewis Shops, Inc., 246 F.2d 44 (2 Cir. 1957); Echeverry v. Kellogg Switchboard & Supply Co., 175 F.2d 900 (2 Cir. 1949); Anderson v. British Overseas Airways Corp. & de Havilland Aircraft Company, Ltd., 144 F.Supp. 543 (S.D.N.Y. 1956); Simonson v. International Bank, supra; Compania Mexicana Refinadora Island, S.A. v. Compania Metropolitana, 223 App.Div. 346, 228 N.Y.S. 36, (1st Dept.) aff'd, 250 N.Y. 203, 164 N.E. 907 (1928).

■ Where, however, the subsidiary has no independent existence and is a mere instrumentality of the foreign corporation, then it may be considered as the agent of the parent through which the parent was conducting business here. The activities of the subsidiary will then be regarded as those of the parent for purposes of acquiring jurisdiction over the parent. Maryland for Use of Mitchell v. Capital Airlines, Inc., 199 F.Supp. 335 (S.D.N.Y.1961); Simonson v. International Bank, supra; Streifer v. Cabol Enterprises, Ltd., 35 Misc.2d 1049, 231 N.Y.S.2d 750 (Sup.Ct., Ulster Co., 1962), aff'd without opinion, 19 A.D.2d 948, 245

N.Y.S.2d 337 (3d Dept. 1963); Goodman v. Pan Am. World Airways, Inc., 1 Misc. 2d 959, 148 N.Y.S.2d 353 (Sup.Ct., Westchester Co.), aff'd without opinion, 2 A. D.2d 707, 153 N.Y.S.2d 600 (2d Dept. 1956); Rabinowitz v. Kaiser-Frazer Corp., 198 Misc. 707, 96 N.Y.S.2d 642 (Sup.Ct., Kings Co., 1950), aff'd without opinion, 278 App.Div. 584, 102 N.Y.S.2d 815 (2d Dept.), aff'd, 302 N.Y. 892, 100 N.E.2d 177 (1951); American Cities Power & Light Corp. v. Williams, 74 N.Y.S.2d 374 (Sup.Ct., N.Y.Co., 1947); Society Milion Athena, Inc. v. National Bank of Greece, 166 Misc. 190, 2 N.Y.S. 2d 155 (Sup.Ct., N.Y.Co., 1937), aff'd without opinion, 253 App.Div. 650, 3 N. Y.S.2d 677 (1st Dept. 1938).

Limited urges that it has already been determined in this court that it was not present here through the activities of its subsidiary Incorporated in two cases decided in 1956—State Street Trust Co. v. British Overseas Airways Corp. and the de Havilland Aircraft Co., Ltd., 144 F. Supp. 241 (S.D.N.Y.1956), and Anderson v. British Overseas Airways Corp. and de Havilland Aircraft Co., supra. In each of these cases it was held that the activities of Incorporated did not make Limited amenable to suit in this jurisdiction, and the action was therefore dismissed as to it for want of jurisdiction.

Both cases proceeded upon the view, widely held in this district prior to Arrowsmith v. United Press International, supra, that the question of amenability to suit in a diversity action brought in the federal court was to be determined by federal rather than state law. But, as was pointed out in Jaftex Corp. v. Randolph Mills, Inc., 282 F.2d 508, 510–511 (2 Cir. 1960) (overruled by Arrowsmith insofar as it held that federal rather than state law applied), the differences between New York law and federal law with respect to amenability to suit, if at all ascertainable, are slight. The standards applied by the federal courts in this district prior to Arrowsmith were basically the same as those applied by the state courts. Thus, in the Anderson case Judge Levet held that

it was the obligation of the plaintiff to establish that Limited and Incorporated "are not separate entities and that they are actually principal and agent" and he went on to say,

"It is only when a parent corporation directs and manages the affairs of its subsidiary so as to deprive it of any independent corporate existence or financial responsibility, will the activities of the subsidiary be regarded as those of the parent." 144 F.Supp. at 546–547.

This, in essence, is the New York law on the subject.

However, the State Street Trust Co. case and the Anderson case are not necessarily controlling here since the plaintiff has presented some additional facts which were apparently not before the court in either of them.

Plaintiff, on the other hand, urges that this case is controlled by Maryland for Use of Mitchell v. Capital Airlines, Inc., supra, in which Judge Murphy of this court held that Vickers Armstrongs, Ltd. and Vickers Armstrongs, (Aircraft) Ltd., two British aircraft manufacturers which had a subsidiary doing business in New York, were amenable to suit in this district. Despite the plaintiff's strenuous efforts both by presentation and characterization of detailed facts to bring the case at bar within the purview of the Maryland case, she has failed to do so. It is true that there are some similarities between the facts in that case and those in the case at bar. However, the differences between the two cases are much more significant than the similarities.

These differences include the significant fact that in the Maryland case Clarkson, a highly paid employee of one of the British corporate defendants, and a director of the American subsidiary, acted as United States representative of the British companies and was engaged full time in the promotion of sales of Viscount airliners which they produced, one hundred million dollars of which had been sold to American operators. Clarkson was solely responsible to his British

employers and did business out of offices in New York wholly financed and maintained by them. Moreover, the American subsidiary was formed for the purpose of carrying out the obligations of the foreign parents under contracts for the sale of Viscounts to Capitol Airlines. The financial and other arrangements between the parents and the subsidiary were such as to make it plain that the subsidiary had no independence of action nor separate financial responsibility and was for all practical purposes a mere instrumentality of the parent.

The position of Fossett in the case at bar and Clarkson in the Maryland case are not at all alike. Fossett was the president of Incorporated, spending his full time on the affairs of that corporation and paid by and responsible to it. He carried on no activities on behalf of Limited apart from his activities as president of Incorporated.

Nor was the position of Incorporated like that of the subsidiary in the Maryland case. Incorporated carried on its own business for its own account though the larger portion of its business was the sale of Limited products. It did substantial business in products which Limited did not manufacture. It had its own premises. It paid all of its own salaries and expenses. It bought for its own account, paid for the products it purchased, sold them to its own customers and was paid by its customers therefor. It maintained substantial inventories on hand in its own storeroom here. Its books of account were independently maintained and not in any way mingled or consolidated with those of its parent.

The basic facts in the record now before the court here do not differ significantly from those before Judge Levet in the Anderson case, and the additional facts which the plaintiff now presents do not change the conclusion as to Limited's amenability to suit reached there.

It is true, as plaintiff points out, that Incorporated's capital was furnished through the purchase of its shares by Limited; that a substantial loan was made by Limited on generous terms and that favorable credit terms were given on products purchased from Limited. But it is quite normal and to be expected that a parent would furnish capital for the operations of its subsidiary, and this by no means establishes that the two were not separate and independent corporate entities. The other financial relations between the two are not only quite normal between parent and subsidiary but, indeed, could not be considered abnormal between any two corporations doing a large volume of business with one another and which had mutual interests. Such transactions were not unduly large in view of the volume of business which Incorporated did. Incorporated operated at a modest profit and paid regular dividends to its sole stockholder. These transactions in no way destroyed the independent financial responsibility of Incorporated nor its corporate independence.

The emphasis which plaintiff places on these financial relationships is indicative of the difficulty with her whole position here. Plaintiff proceeds on the assumption that quite normal business relationships and transactions necessarily have different implications and different legal consequences when they occur between parent and subsidiary. But a parent is entitled to carry on normal business relations with its subsidiary which are mutually advantageous without impairing the independent corporate existence of the subsidiary or making it the agent of the parent.

The arrangements as to servicing of Doves and Herons in this country are in the same category, quite apart from the fact that these arrangements came to an end in any event long before this action was commenced. While Limited supplied engineers and paid Incorporated substantial sums for such servicing Incorporated in turn took on the obligation of seeing that such servicing was carried out and of paying substantial expenses in that connection. The agreement was plainly to the mutual advantage of both companies, both interested in the sale of Limited products.

The facilities afforded officers and representatives of Limited on visits to this country were no more than ordinary courtesies which would be required from a local corporation which purchased much of its product inventory from a single foreign source. Fossett's activities also are no more than could be expected of the president of such a local corporation.

■ Incorporated carried on business as an independent coporate entity for seven years prior to the commencement of this action. The fact that Limited had conducted business activities in the United States on its own behalf prior to that time, some of which were taken over by Incorporated as part of its own business, does not change the independent status of Incorporated or make its activities those of Limited. Limited was entitled to form a subsidiary corporation to do business in New York without subjecting itself to jurisdiction here.

The various New York cases holding a parent subject to jurisdiction because its local subsidiary had no independent existence and was its mere instrumentality, are not in point for their facts are quite different from those in the case at bar.

Thus, in Society Milion Athena, Inc. v. National Bank of Greece, supra, the subsidiary banking corporation was organized principally because the parent foreign bank was forbidden by law to do certain types of banking here, and the subsidiary's activities were not the ordinary services performed by a correspondent bank but amounted "rather to the actual performance of business in this state in a systematic and regular fashion" by the parent through the agency of its subsidiary.

In Rabinowitz v. Kaiser-Frazer Corp., supra, there was complete disregard within the corporate structure of any of the distinct corporate entities of four consolidated subsidiaries, one of which did business here, and the executive offices of both parent and subsidiary were located at the same office in New York, where business affairs were conducted for both companies.

In Goodman v. Pan Am. World Airways, Inc., supra, both parent and subsidiary shared the same main offices in Hartford, Connecticut, and the subsidiary doing business here was patently merely another one of the parent's divisions.

In Streifer v. Cabol Enterprises, Ltd., the subsidiary doing business here was merely a shell. It had no income of its own, and the salaries of all of its officers and employees were paid by the parent.

In American Cities Power & Light Corp. v. Williams, supra, the subsidiary had no independent existence but was used by the parent merely as a vehicle for the ownership, purchase and sale of such securities as the parent deemed desirable and had the same officers and directors as the parent, who conducted the business of the parent from the offices of the subsidiary in New York.

■ I find that Incorporated carried on its business as a corporate entity separate, apart from and independently of its parent Limited. The separation between the two was not only formal but also real. Limited cannot be subjected to jurisdiction in this district on the basis of Incorporated's activities in this state. Cannon Mfg. Co. v. Cudahy Packing Co., supra; Cook v. Bostitch, Inc., supra; Simonson v. International Bank, supra. Since Limited itself carries on no significant activities in this state and has no agent acting here on its behalf it is not amenable to suit in this jurisdiction and the complaint against it must be dismissed for want of jurisdiction over the person.

What has been said makes it unnecessary to discuss the plaintiff's contention that the service of process on Fossett individually and as president of Incorporated constituted service on Limited since neither was empowered to act or did act as agent for Limited and neither was authorized to receive service on Limited's behalf. And of course the question raised as to venue is quite academic.

The motion of defendant Limited to dismiss the complaint as against it is therefore granted.